IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LUKE JOHNSON, individually and on behalf of similarly situated individuals, | |
| Plaintiff, | Case No. 24 cv 5691 |
| v. | Honorable Sunil R. Harjani |
| HUMAN POWER OF N COMPANY, d/b/a HUMANN, | |
| Defendant. | |

## MEMORANDUM OPINION AND ORDER

This lawsuit involves the quintessential modern problem of receiving unwanted spam text messages after unsubscribing from them. Plaintiff, Luke Johnson, alleges that Defendant, Human Power of N Company, continued to send him text messages despite submitting an unsubscribe request. Defendant moves to compel arbitration based on the arbitration clause in its Messaging Terms and Conditions. Doc. [10]. Plaintiff argues that he did not agree to arbitrate when he initially signed up for the text messages. For the reasons stated below, Defendant's motion [10] is denied, and this case will proceed in federal court.

### Background

Defendant sells nutrition supplements and functional foods through retailers and on its own website. Plaintiff accessed Defendant's website and received the below pop-up message offering him 15% off if he signed up to receive emails and text messages from Defendant. Plaintiff clicked on the orange "GET 15% OFF NOW" button and was brought to a separate webpage where he had to enter his personal information in order to receive messages. Plaintiff then agreed to receive messages from Defendant.



After he started receiving messages from Defendant, Plaintiff followed the instructions to unsubscribe from the messaging system by replying "STOP." Plaintiff alleges that despite this, he continued to receive messages from Defendant in violation of the Telephone Consumer Protection Act, 47 U.S.C. §§ 227, *et seq*. Defendant argues this claim should be arbitrated because Plaintiff consented to the arbitration provision contained in the Messaging Terms and Conditions, which were available via hyperlink and connected to the word "Terms" in the above pop-up advertisement.

## Legal Standard

The Supreme Court has repeatedly emphasized that arbitration is a creature of contract. *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011). "Whether an agreement to arbitrate has been formed is governed by state-law principles of contract formation." *Domer v. Menard, Inc.*, 116 F.4th 686, 694 (7th Cir. 2024). Although the parties disagree on which state law applies, in cases like this one involving whether an agreement to arbitrate has been formed, the analysis

"calls for the application of general rules of contract formation, so the choice of law is not likely to affect the outcome." *Id.*

"Under the [Federal Arbitration Act], arbitration should be compelled if three elements are present: (1) an enforceable written agreement to arbitrate, (2) a dispute within the scope of the arbitration agreement, and (3) a refusal to arbitrate." *Scheurer v. Fromm Family Foods LLC*, 863 F.3d 748, 752 (7th Cir. 2017). However, a "party 'cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'" *Id.* (quoting *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960)). Plaintiff only disputes the first element. As the movant, Defendant bears the burden of proving the agreement to arbitrate exists.

## Discussion

While the issues raised here—unwanted text messages and hyperlinked terms containing arbitration agreements—are thoroughly modern problems, courts must consider them through the lens of traditional contract interpretation. A party who signs a written contract is presumed to have notice of the contract's terms. *Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1034 (7th Cir. 2016). The challenge is applying this general principle to newer types of contracts formed on the internet. Forming a contract requires mutual assent, and although the parties do not need to share the same subjective understanding of the terms, there "must be a meeting of the minds" regarding the terms. *Id.* "Illinois contract law requires that a website provide a user reasonable notice that his use of the site or click on a button constitutes assent to an agreement." *Id.* at 1036.

When considering online agreements, courts often group them into two categories: clickwrap agreements and browsewrap agreements. Clickwrap agreements have "I accept" buttons or boxes that a customer can click. In contrast, browsewrap agreements "which provide

3

veiled notice to customers that mere use of the website constitutes agreement to various terms and conditions" are generally unenforceable. *Domer*, 116 F.4th at 695.

However, actual online agreements, including the one at issue here, often fall in-between these two categories. These "hybrid" agreements typically "prompt the user to manifest assent after merely presenting the user with a hyperlink to the terms and conditions, rather than displaying the terms themselves." *Wilson v. Redbox Automated Retail, LLC*, 448 F. Supp. 3d 873, 882 (N.D. Ill. 2020) (internal quotation omitted). As this makes the users assent passive, the contract is only enforceable if: "(1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." *Domer*, 116 F.4th at 695 (quoting *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022)). This is a fact-intensive legal analysis. *Id.*

## I. Did Plaintiff Unambiguously Manifest Assent?

The answer to the second step of the analysis is both crystal clear and dispositive. While there is nothing automatically offensive to an online agreement initiated by a click on a website, "the layout and language of the site [must] give the user reasonable notice that a click will manifest assent to an agreement." *Sgouros*, 817 F.3d at 1033–34 (citing *Hancock v. Am. Tel. & Tel. Co.*, 701 F.3d 1248, 1257 (10th Cir. 2012)). Courts "cannot presume that a person who clicks on a box that appears on a computer screen has notice of all contents not only of that page but of other content that requires further action (scrolling, following a link, etc.)[.]" *Id.* at 1035. The problem for Defendant is that nothing on its advertisement indicates that by clicking the button a consumer is agreeing to abide by the terms. The disclosure states in full:

> By signing up via text, you agree to receive recurring automated promotional and personalized marketing text messages (e.g. cart reminders) from humann at the cell

4

> number use when signing up. Consent is not a condition of any purchase. Reply HELP for help and STOP to cancel. Msg frequency varies. Msg and data rates may apply. View Terms & Privacy.

Doc. [11] at 6 (emphasis in original). Nothing in this disclosure alerts the consumer that by clicking the "GET 15% OFF NOW" button they are assenting to the hyperlinked terms. Instead, it tells the consumer that by signing up, they are agreeing to receive automated promotional messages and explains how to stop the messages. Then at the end, it says "View Terms & Privacy." But that does not indicate that the consumer will be bound by those terms.

An illustrative example demonstrating why this is insufficient is *Sgouros v. TransUnion Corporation*, 817 F.3d 1029 (7th Cir. 2016). In *Sgouros*, the Seventh Circuit considered whether a consumer consented to TransUnion's terms of use when purchasing his credit score package. As part of the "Step 2" webpage, the user had to enter a credit card number, create a username, password, security question and answer, and asked if their home address was the same as their billing address. *Id.* at 1032. Then there was a rectangular scroll box that included the words "Service Agreement" and the first two and a half lines of the agreement. *Id.* Underneath the scroll box was a disclosure that stated in bold:

> You understand that by clicking on the "I Accept & Continue to Step 3" button below, you are providing "written instructions" to TransUnion Interactive, Inc. authorizing TransUnion Interactive, Inc. to obtain information from your personal credit profile from Experian, Equifax and/or TransUnion. You authorize TransUnion Interactive, Inc. to obtain such information solely to confirm your identity and display your credit data to you.

*Id.* at 1033. After this disclosure, there was an "I Accept & Continue to Step 3" button to proceed. *Id.* The Seventh Circuit found that the page did not require him to scroll through the text box and that nothing called the user's attention to the arbitration agreement "buried at page 8 of the full, 10–page printable version of the Service Agreement[.]" *Id.* Also, the visible language in the text box fell "short of providing notice that the purchase of a consumer credit score is subject to the

agreement." *Id.* at 1035. The appellate court also determined that the disclosure text "actively misleads the customer" by notifying him that "clicking on the box constituted his authorization for TransUnion to obtain his personal information" but said "nothing about contractual terms." *Id.* Thus, a reasonable person would not have realized they were assenting to TransUnion's service agreement when they clicked "I Accept & Continue to Step 3."

Similarly, the visible elements of the disclosure on Defendant's webpage do not inform the consumer that they are consenting to the Messaging Terms and Conditions. The disclosure notifies a consumer that they are agreeing to receive automated text messages from Defendant. The Terms and Conditions are hyperlinked, but they are merely prefaced as "View Terms" without any indication that a consumer is consenting to the terms by clicking the button. Like the disclosure in *Sgouros*, Defendant's disclosure indicates an agreement to something else (*i.e.* receiving text messages). So as with the disclosure in *Sgouros*, a reasonable person would not have realized they were assenting to Defendant's terms.

The phrasing of the disclosure is particularly important given that Defendant has complete control over the language of its own website and could have written the disclosure in any way. As the Seventh Circuit noted, providing "a user reasonable notice that his use of the site or click on a button constitutes assent to an agreement … is not hard to accomplish, as the enormous volume of commerce on the Internet attests." *Sgouros*, 817 F.3d at 1036. Defendant could have—as the companies did in almost every other case reviewed by the Court—write that by "signing up for" or "registering for" messaging or "by clicking on the GET 15% OFF NOW button" the consumer was agreeing to the Messaging Terms and Conditions. *See, e.g.*, *Domer*, 116 F.4th at 692 ("By submitting your order you accept our Terms of Order."); *Miracle-Pond v. Shutterfly, Inc.*, 2020 WL 2513099, at *1 (N.D. Ill. May 15, 2020) ("By tapping 'Accept', you agree to use the … services

6

in accordance with Shutterfly's Terms of Use."); *Campos v. Tubi, Inc.*, 716 F. Supp. 3d 623, 628 (N.D. Ill. 2024) ("By registering, you agree to Tubi TV's … Terms of Use …."); *Azuz v. Accucom Corp.*, 2023 WL 2525486, at *1 (N.D. Ill. Mar. 15, 2023) ("Conducting a search on InfoTracer.com is subject to our Terms of Service …."); *Fischer v. Instant Checkmate LLC*, 2021 WL 3033586, at *1 (N.D. Ill. July 19, 2021) ("By clicking 'Continue' you represent that you … have agreed to our terms of use …."). "[T]he onus must be on website owners to put users on notice of the terms to which they wish to bind consumers[.]" *Berman*, 30 F.4th at 857 (quoting *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1179 (9th Cir. 2014)). Here, the onus was on Defendant to make clear that a consumer was assenting to the terms by clicking the button; but it did not.

Defendant's disclosure provides even less notice to the consumer, than the disclosure the district court found insufficient to manifest assent in *Anand v. Heath*, 2019 WL 2716213 (N.D. Ill. June 28, 2019). In *Anand*, the district court found that a hybrid agreement was unenforceable when the disclosure said, "I understand and agree to the Terms & Conditions ..." and the consumer had to click a "Continue" button, because there was no indication that the agreement was connected to clicking the "Continue" button. *Id.* at *4. Here, the disclosure is less descriptive as there is nothing indicating to the consumer that by clicking the "GET 15% OFF NOW" button, or any other action, they were consenting to Defendant's terms. The disclosure only tells the consumer that by registering to receive messages they are agreeing to receiving recurring messages, without any indication that they are agreeing to the Defendant's terms. *Sgouros*, 817 F.3d at 1035 ("[W]here a website specifically states that clicking means one thing, that click does not bind users to something else."). As such, Plaintiff did not unambiguously manifest his assent to the Messaging Terms and Conditions and cannot be bound by the arbitration clause therein.

7

## II.     Did the Website Provide Reasonably Conspicuous Notice?

Although Plaintiff did not unambiguously assent to the agreement, and thus is not bound to it, the Court will also consider whether the notice was reasonably conspicuous. Courts evaluate notice from the objective perspective of a "reasonable online shopper—that is, a person who is neither an expert nor a novice with technology." *Domer*, 116 F.4th at 695 (citing *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 77 (2d Cir. 2017)). The Seventh Circuit instructs courts to consider five factors when deciding whether a disclosure has afforded fair notice: "(1) the simplicity of the screen; (2) the clarity of the disclosure; (3) the size and coloring of the disclosure's font; (4) the spatial placement of the hyperlink; and (5) the temporal relationship to the user's action." *Id.* No single factor is dispositive; instead, the focus is on whether reasonable notice was provided when considering the whole webpage. *Id.*

"Where, as here, 'terms are not displayed' directly to a user, but instead 'must be brought up by using a hyperlink,' a 'clear prompt directing the user to read them' is required." *Id.* at 696 (quoting *Sgouros*, 817 F.3d at 1035). Typically, this requires that the "statement [be] prominently offset from other text" by being "bold, capitalized, or conspicuous in light of the whole webpage." *Id.* (quoting *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 290 (2d Cir. 2019)). To sufficiently set apart the text, the website "must do more than 'simply underscore the hyperlinked text[.]'" *Id.* (quoting *Berman*, 30 F.4th at 857). The Seventh Circuit noted that the "[c]ustomary design elements denoting the existence of a hyperlink include the use of a contrasting font color (typically blue) and the use of all capital letters." *Id.* at 696–97 (quoting *Berman*, 30 F.4th at 857).

The hyperlink here does not meet any of these criteria. First, as discussed above, there is no prompt directing the consumer to read the terms. Merely writing "View" is an insufficient prompt when there is no additional statement explaining the importance of the hyperlinked

information to the consumer. This is unlike cases such as *Domer* where the company's disclosure included this text: "**Please note**: ... By submitting your order you accept our Terms of Order[,]" followed by a bright green hyperlink to the terms that was different from the black font of the disclosure. *Domer*, 116 F.4th at 697 (emphasis in original). Here, the disclosure lacked any indication that the consumer was accepting the terms. Further, the hyperlink to the terms was in the same color, size, and font as the surrounding text, so nothing designates it as a hyperlink. While hyperlinks are typically blue, courts have found that a particular color is not required, so long as the contrast is evident. *See id.* (finding a green hyperlink was sufficient). Defendant's hyperlink was only underscored and not marked in bold, all capital letters, or a different color font, and is therefore insufficient.

Also, Defendant's hyperlink is not close spatially or temporally to an act that could be considered the customer's assent. The Seventh Circuit established that the disclosure "advising users of terms should be spatially coupled with the act deemed to manifest assent to those terms" and be "on the same page" as the required action.[1] *Domer*, 116 F.4th at 698–99. As discussed above, Plaintiff did not unambiguously manifest assent because there was no indication that, by clicking the "GET 15% OFF NOW" button, he agreed to Defendant's Messaging Terms and Conditions. This page is not where the consumer enters their information and agrees to receive messages—pushing that button merely brings a consumer to the page where they can register to receive messages from Defendant. Consequently, the fact that the button is spatially close to the terms does not weigh in favor of finding the notice was reasonably conspicuous.

---

[1] Although the spatial placement and temporal relationship can be considered separately, when, as here, the action manifesting assent takes place on a separate webpage from the disclosure and terms, the analysis is largely overlapping. As such, the Court considers these factors together.

This separation between the consumer registering for the messaging and the hyperlink to the terms is significant. In the more common fact pattern, a consumer pushes the button—giving their consent—on the same page that the disclosure is on. For example, in *Domer*, the disclosure and hyperlinks were located directly below where a customer entered their billing and credit card information and on the same webpage that the customer submits their order. 116 F.4th at 698. This "leaves no discrepancy between the necessary act (clicking the 'SUBMIT ORDER' button) and the disclosure requiring assent." *Id.* at 699. Here, however, the registration to receive text messages was on a different, and later, webpage than the hyperlink to the terms, making it temporally distant from the customer's assent.

Instead, Defendant's disclosure is similar to the separation between the terms and the registration that the court found objectionable in *Campos v. Tubi, Inc.*, 716 F. Supp. 3d 623 (N.D. Ill. 2024). In *Campos*, the district court found that the prompt: "By registering, you agree to Tubi TV's [Terms of Use]," on the first page of the registration was too spatially distant from the actual registration. *Id.* at 632. The district court also determined that nothing on that first page indicated that by clicking the "Continue with …" button consumers manifested assent to the terms. *Id.* Instead, the district court found that placing these terms on the first page but not on the page where a consumer registers was insufficient. Similarly, in Defendant's pop-up advertisement, the "Terms" hyperlink is on a page before the actual registration page, which places it spatially and temporally apart from the consumer's registration to receive text messages. So, a reasonable online shopper would not be expected to associate those terms with their action in registering. Moreover, the notice here is less conspicuous than in *Campos*, where the prompt notified consumers that "By registering, you agree to Tubi TV's [Terms of Use.]" 716 F. Supp. 3d at 632. However, Defendant's disclosure merely says, "View Terms", which, as discussed above, does not indicate to the

10

consumer that they are consenting to those terms, especially when the terms are on a separate webpage from where a consumer registers. Thus, a reasonable online shopper would not suspect that they have consented to the terms as Defendant failed to provide reasonably conspicuous notice.

## Conclusion

For the reasons stated above, Defendant's motion to compel arbitration [10] is denied.

**SO ORDERED.**

Dated: February 25, 2025

_____
Sunil R. Harjani
United States District Judge